Dale E. Barney (Attorney No. 034651987)
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4557
dbarney@gibbonslaw.com

*Attorneys for Plaintiff*
*Discover Growth Fund II, LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DISCOVER GROWTH FUND II, LLC,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>THEODORE ELLENIS, ROBERT MIRAGLIOTTA, JAMES MCCARTHY, SCOTT HOSPES, LACARYA SCOTT, JASON BODNICK, HARRY CHARNLEY, SCOTT CHILSON, JEMAL BEALE, CRAIG BARTLETT, BRAY BARNES, and PETER MCGUIRE,<br><br>　　　　　　Defendants. | Civil Action No. <u>25-02048</u><br><br>JURY DEMANDED |

## COMPLAINT

Discover Growth Fund II, LLC ("Plaintiff"), by its attorneys, files this Complaint against

the former officers, directors and attorneys of bankrupt Municipal Finance & Services Corp., a

New Jersey corporation ("MFSC"), and alleges as follows:

## NATURE OF THE ACTION

1.　　MFSC was a Ponzi scheme orchestrated by serial fraudsters Theodore Ellenis and

Robert Miragliotta, and their nefarious cohorts, who together defrauded Plaintiff and other

1

investors out of over $7 million, which they used to line their own pockets—including personal expenses ranging from prostitutes and expensive non-business entertainment to one of their children's private school education—and to create the false impression that MFSC was successful in order to entice more investment and induce forbearance. MFSC was rife with conflicts of interest and self-dealing, with its directors, officers, employees and representatives all looking out for themselves and their own interests, rather than protecting the company and its stakeholders to whom they owed fiduciary duties.

2.     Defendants represented that MFSC had invented unique and valuable technologies to facilitate timely payment of vendor invoices by municipalities and other governmental entities, and that MFSC was in the business of providing municipal financing for its proprietary payment program. Despite the defendants' many promises and representations, in truth and in fact MFSC had not created anything, had no proprietary intellectual property, never had any real chance of success, and never earned a single penny in revenues, let alone profits. In furtherance of their fraudulent scheme, defendants used money obtained from new investors to pay back older investors, the classic hallmark of a Ponzi scheme. Defendants created shell companies to launder their ill-gotten gains and continue their fraudulent schemes. MFSC is now in bankruptcy, and the defendants have either pilfered and run off with the company's assets, including millions of dollars, or negligently failed to prevent the other defendants from doing so.

3.     On June 21, 2024, MFSC filed a chapter 7 petition in the United States Bankruptcy Court for the District of New Jersey, the Honorable Michael B. Kaplan, C.U.S.B.J., presiding, commencing a case captioned *In re Municipal Finance & Services, Inc.,* Case No. 24-16256-MBK. John M. McDonnell, Esq. has been appointed as chapter 7 Trustee by the United States Trustee for Region 3, to liquidate the company's assets and pay creditors, investors and shareholders what

little is left.  MFSC is not named as a defendant because the automatic stay is in place, and none of the claims in this Complaint are brought by, against or on behalf of the debtor or the bankruptcy estate.  Plaintiff brings this direct action against defendants to recover its own $5 million investment procured as a result of defendants' fraud.

## PARTIES AND RELATED ENTITIES

4.  Plaintiff Discover Growth Fund II, LLC ("Plaintiff") is a limited liability company organized and existing under the laws of the Virgin Islands of the United States.

5.  Municipal Vendor Services, Inc. ("MVS") is a corporation organized and existing under the laws of the State of Delaware.  On information and belief:  MVS maintains its principal executive offices c/o Theodore Ellenis, 107 George Russel Way, Clifton, New Jersey.  MVS was created by Ellenis, Robert Miragliotta and others to siphon away Plaintiff's money, as well as other investors' money, business opportunities and other assets that belonged to MFSC, for the benefit of himself and other D&O Defendants (defined below).  As evidenced by (i) an MVS "Executive Summary" and (ii) an MVS "Shareholder Update," both dated June 2024 and discussed further below, Ellenis and others are intentionally concealing the physical location of MVS and GFS and their assets, to secrete assets that those entities took from MFSC.

6.  Government Finance & Services, Inc. ("GFS") is a corporation organized and existing under the laws of the State of New Jersey.  On information and belief:  GFS  maintains offices c/o Ellenis, 107 George Russel Way, Clifton, New Jersey.  GFS was and is being used by Ellenis and others to siphon away Plaintiff's money, as well as other investors' money, business opportunities and other assets that belonged to MFSC, for the benefit of himself and other D&O Defendants.

7.  CeleraFi Corp. ("CeleraFi") is a corporation organized and existing under the laws of the State of Delaware.  On information and belief:  CeleraFi maintains offices c/o Jason

Bodnick, 407 South East Fourth Avenue, Delray Beach, Florida.  Upon information and belief, CeleraFi was and is being used by Bodnick and Lacarya Scott to siphon away MFSC's business opportunities and other assets that belonged to MFSC, for the benefit of themselves.  Bodnick, Scott and others developed CeleraFi while at MFSC using money, assets and business relationships.  While being paid money that came from Plaintiff to work for and on behalf of MFSC, Bodnick and Scott instead apparently flagrantly violated their fiduciary duties by creating CeleraFi for themselves, and are now engaging in a business substantially similar to that of MFSC, with only minor and inconsequential differences, using MFSC's intellectual property, corporate opportunities and know-how for their own personal benefit.

8.    Defendant Theodore Ellenis ("Ellenis") is the former Chief Executive Officer (CEO) and Chairman of the Board of Directors of MFSC.  Ellenis was CEO from October 2021 to August 2023.  He then became CEO of GFS and is now CEO of MVS, both of which purport to be in substantially the same business as MFSC, with only minor and inconsequential differences.

9.    Defendant Robert Miragliotta ("Miragliotta") is the former Chief Financial Officer (CFO) and member of the Board of Directors of MFSC.  Miragliotta is a recidivist securities law violator, having been sanctioned by both FINRA and the New Jersey Bureau of Securities for investment fraud including willfully failing to disclose a material fact in connection with the sale of securities.  Along with Ellenis, after MFSC he became CFO of GFS and is now CFO of MVS.

10.    Defendant Lacarya Scott ("Scott") was a member of the MFSC Board of Directors and acted as Chief Executive Officer of MFSC prior to the company's bankruptcy.  Scott joined MFSC in February 2022 as a member of the company's Advisory Committee and was later elected to the company's Board of Directors, purportedly to protect the interests of Plaintiff and the other preferred stockholders.  Scott had a flagrant conflict of interest, and was really only interested in

generating fees for his investment banking firm, Tungsten Advisors, including receiving payments from the funds invested by Plaintiff. Though Scott discovered the truth of the fraud, he hid it, in order to enable himself to divert company assets and start his own competing company with Bodnick.

11.    Defendant James McCarthy ("McCarthy") is an attorney at law licensed to practice in New Jersey, and was a member of the MFSC Board of Directors and the General Counsel or Chief Legal Officer of MFSC. McCarthy used MFSC to gift himself free office space for his law firm, and maintained an exorbitantly expensive office lease for space that was completely unused by MFSC, and instead was used only be himself and his paralegal. Despite this flagrant conflict of interest, rather than cancelling the lease and vacating the space, he renegotiated—purportedly on behalf of MFSC—to maintain the space so that he and his personal employee could use it, which was a complete waste of MFSC corporate assets.

12.    Defendant Scott Hospes ("Hospes") was the Chief Operating Officer and Chief Information Officer of MFSC, and signed its chapter 7 petition in that capacity. He transitioned into that role in April 2023 to oversee the rollout of MFSC's flagship product, the Accelerated Municipal Payments (AMP) platform. Hospes was a self-styled technology genius, who claimed to have created the software and other intellectual property behind the purportedly revolutionary AMP product. In reality, he created nothing. The technology was non-existent, and his claims were a complete fraud.

13.    Defendant Jason Bodnick ("Bodnick") was Executive Vice President, Corporate Development, at MFSC. He joined MFSC in late 2021. Though Bodnick discovered the truth of the fraud, he hid it, in order to enable himself to divert company assets and start his own competing company with Scott.

14.    Defendant Harry Charnley ("Charnley") was Vice President of the Finance Department of MFSC. He joined in September 2022.  Though charged with overseeing company finances and protecting the money for investors, Charnley instead allowed millions to be dissipated into the hands of the other defendants.  Upon information and belief, Charnley allowed and covered up payments he knew to be fraudulent, improper and illegal.

15.    Defendant Scott Chilson ("Chilson") was a Vice President in the Sales Department of MFSC.  He was paid a regular salary to sell nothing.  He willfully participated in both the fraud and the cover up, in order to be paid to do nothing.

16.    Defendant Jemal Beale ("Beale") was a member of MFSC's Board of Directors.  Beale is also the Chief Executive Officer and President of Apex Solutions Group, LLC, a business management company that contracted to provide payment processing services to MFSC, although it never actually processed any payments, other than "penny tests" because MFSC never actually sold any services to any municipalities.  Like the other board members of MFSC, Beale had a flagrant conflict of interest, and was more interested in protecting his own personal interests than the company's.

17.    Defendant Craig Bartlett ("Bartlett") was a member of the MFSC Board of Directors.  Bartlett knew or should have known of the other defendant's misconduct, and negligently failed to take any action to protect Plaintiff, MFSC or its stakeholders.

18.    Defendant Bray Barnes ("Barnes") is a former member of the MFSC Board of Directors.  Barnes was also the Chief Operating Officer of MFSC, and sought to become the Chief Executive Officer of the company.  Barnes knew or should have known of the other defendants' misconduct, and negligently failed to take any action to protect Plaintiff, MFSC or its stakeholders.

19.    Defendant Peter McGuire("McGuire")  is a former member of the MFSC Board of Directors and was an employee of MFSC.  McGuire knew or should have known of the other defendants' misconduct, and negligently failed to take any action to protect Plaintiff, MFSC or its stakeholders.

20.    Defendants Ellenis, Miragliotta, Scott, McCarthy, Hospes, Bodnick, Charnley, Chilson, Beale, Bartlett, Barnes and McGuire are collectively referred to herein as the "D&O Defendants".

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a).

22.    As set forth in greater detail below, this Court has supplemental subject-matter jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. § 1367(a), which provides that, "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

23.    This Court has personal jurisdiction over the D&O Defendants, because each was a director and/or officer of MFSC, a corporation formed and existing under the laws of the State of New Jersey, conducting business and maintaining operations in this District, and with its principal place of business located in this District.  Each of the defendants actively participated in the activities of MFSC in New Jersey, owed fiduciary duties under New Jersey law to the corporation and its creditors and shareholders, and engaged in, aided and abetted the fraudulent scheme described herein.

24.    Venue is proper in this District under 28 U.S.C. §§ 1391 and 1404 because a substantial portion of the transactions and wrongs complained of here occurred in this District.

## SUBSTANTIVE ALLEGATIONS

### *Overview*

25.     MFSC purported to be in the business of providing financing to municipalities and other governmental entities to facilitate those entities' timely payment of their vendors' invoices. This is not a case of mere hopeful projections, but of lies to induce investors to bankroll the defendants' lavish spending and personal livelihoods.  Ellenis and Miragliotta, among others, assured Plaintiff that they were highly experienced experts in municipal funding, that MFSC had ready contracts in place and about to be signed with multiple jurisdictions, that they had secured lending commitments in the hundreds of millions, and that MFSC was soon to be profitable.  Scott Hospes and Jason Bodnick, among others, assured Plaintiff that MFSC had developed a valuable "tech stack" that enabled the company to provide a unique payment solution to municipalities that no one else could match.

26.     The reality, however, was far bleaker.  At the time of Plaintiff's investment, MFSC had little cash on hand, no secured lending commitments, and few binding commitments from any municipalities.  Moreover, the purported tech stack was non-existent, and the company had no real proprietary technology of any kind, let alone unique or valuable technology.  The D&O Defendants were selling the software equivalent of snake oil.  The D&O Defendants willfully concealed that not a single vendor had ever agreed to pay for the purported services, or expressed the slightest interest in doing so at any price, let alone the exorbitant rates that defendants represented MFSC could charge for its services, even assuming they existed, which they did not.

27.     Moreover, despite their promises to the contrary, the D&O Defendants had no reason to believe that their business model could possibly be successful, as they had completed no legitimate market research or analysis justifying their "pie in the sky" projections, promises and representations, all of which were simply made up.  Like their fictitious technology, none of the

numbers were remotely real.  For example, under Ellenis' stewardship, MFSC apparently did little or no diligence as to whether or not the target municipalities paid their vendors late so as to be suitable users of MFSC's financing services.  In fact, the municipalities that MFSC spent Plaintiff's money pursuing were current payors to their vendors that had no use for MFSC's expensive and useless expedited vendor payment program.

28.    Even more damning, the D&O Defendants never had any intention of using Plaintiff's investment to develop and grow a real business.  Instead, they always intended to steal from the company coffers, using the money they defrauded MFSC's unsuspecting investors out of to pay personal expenses that were knowingly mischaracterized as legitimate business expenses.

29.    The D&O Defendants set up MFSC to fail so that they could take what little value was actually created for themselves, through newly-formed shell companies, MVS, GFS and CeleraFi, to which they diverted company assets and through which they are now continuing their fraudulent schemes unabated.  None of that plan was disclosed to Plaintiff.

30.    In reasonable reliance on the D&O Defendants' many lies and failures to disclose, Plaintiff invested $5 million in MFSC in February 2023.  Once MFSC received Plaintiff's investment, Ellenis, Miragliotta and their minions quickly squandered it.  Their theft was highlighted by hundreds of thousands of dollars spent on travel and entertainment; personal expenses including prostitutes, Ellenis's daughter's private school tuition, Caribbean vacations, food and liquor; and unnecessary new offices that cost approximately $500,000 per year—none of which were beneficial to the company or necessary to generate business.

31.    Less than one year after receiving Plaintiff's $5 million, MFSC had yet to process a single vendor, received no new binding municipal contracts, secured no new lending commitments, and was financially insolvent.

32.     Another casualty of defendants' scheme was Plaintiff's dividend payments. Despite MFSC's contractual obligation to pay Plaintiff dividends, the defendants never caused MFSC to pay Plaintiff.  To date, MFSC owes Plaintiff more than half a million dollars in dividends.

33.     Even worse, the D&O Defendants caused or allowed MFSC to pay dividends to at least one older investor, Sixth Borough Capital.  In other words, the defendants used Plaintiff's investment funds to pay older investors:  a textbook Ponzi scheme.

### *Transactions*

34.     On February 9, 2023, Plaintiff purchased more than 26 million shares and warrants in MFSC for $5 million, and further agreed to lend MFSC at least $6.5 million per month to help the company fund its business operations.

35.     These transactions took the forms of two agreements and related documents, which together form the transactional basis of this Complaint.  The first, a true and correct copy of which is attached hereto as ***Exhibit A***, is the Subscription Agreement and Investment Letter with related warrant (the "Subscription Agreement"), in which Plaintiff agreed to purchase 13,804,527 shares of 10% Convertible Series "A" Preferred Stock and 13,804,527 Class "A" Preferred Stock Purchase Warrants for $4,999,999.67.

36.     The convertible preferred stock gave Plaintiff the option to convert its preferred shares to common stock if it wished; the Subscription Agreement specified that Plaintiff could exercise that option at $0.3622 per share for one year after purchase.

37.     In addition, the "Series A" tranche of convertible preferred stock requires MFSC to pay Plaintiff dividend payments.  Under § B.1.1 of MFSC's Certificate of Amendment of Certificate of Incorporation ("Certificate of Amendment"), filed with the State Treasurer of New Jersey on November 1, 2021, cumulative "dividends at the rate of $0.0363 per annum shall be paid

on a monthly basis on each issued and outstanding share of Series A Preferred Stock." Under New Jersey law, the Certificate of Amendment is a contractual obligation of MFSC to its preferred shareholders.

38.    The preferred stock purchase warrants functioned similarly to the convertible preferred stock in that Plaintiff had the option to convert a warrant to preferred stock at the fixed price of $0.3622 for one year after purchase.

39.    As of February 10, 2023 (the day after Plaintiff and MFSC executed the Subscription Agreement), Plaintiff was the plurality shareholder in MFSC, owning 27,609,056 units of preferred shares and making up 29.6435% of the company's total shares.

40.    The second document critical to this dispute is the Master Loan Agreement (the "Funding Agreement"), a true and correct copy of which is attached hereto as ***Exhibit B***, which has an "Effective Date" of February 9, 2023, and is executed by and between Plaintiff and MFSC. In the Funding Agreement, Plaintiff agreed to lend money to MFSC to help the company fund its purported business operations.

41.    Specifically, § 11 of the Funding Agreement, titled "Security Interest," provides that "Borrower [MFSC] grants to Lender [Plaintiff] a continuing security interest in the Collateral to secure all Obligations and the performance of Borrower's duties hereunder. The security interest will be a first priority security interest in the Collateral." Exhibit C to the Funding Agreement defines "Collateral" as "all assets of" MFSC. Section 2 of the Funding Agreement, titled "Definitions," defines "Obligations" as "those, liabilities, obligations, covenants and duties owing, arising, due or payable by Borrower to Lender under this Agreement."

42.    Plaintiff perfected its security interest in the collateral by filing a UCC-1 Financing Statement in favor of Plaintiff, as secured party, with respect to the Collateral ("State UCC-1 A").

The State UCC-1 A was filed with the New Jersey Department of Treasury - UCC Section on February 10, 2023 as Inst. # 56431520, resulting in Plaintiff holding a valid and perfected first-priority security interest in the Collateral.

43.     Section 12 of the Funding Agreement, titled "Events of Default," lists six events of default with "[a]ny one or more" of the events qualifying:

    a.     Borrower fails to pay any amount owed to Lender when due;

    b.     Borrower becomes insolvent;

    c.     Any involuntary lien, garnishment, attachment attaches to the Collateral;

    d.     Failure to establish a dedicated account according to Section 5.3(f);

    e.     A material impairment in the perfection or priority of the Lender's security interest in the Collateral, a material adverse change in the business, operations, or conditions (financial or otherwise) of the Borrower occurs or a material impairment of the prospect of repayment of any portion of the Advances occurs.

    f.     A material breach of this Agreement or any loan agreement, following thirty (30) days' notice and opportunity to cure as provided in Section 13.2 below.

44.     Section 13 of the Funding Agreement, titled "Remedies," provides that, "[w]hen an Event of Default occurs . . . at Lender's option and on demand, all or a portion of the Obligations under this Agreement may be due and payable in full; and . . . Lender may exercise all rights and remedies under this Agreement and the law" including secured parties' rights under the Uniform Commercial Code or the U.S. Bankruptcy Code, "and the right to collect, dispose of, sell . . . and realize upon all . . . Collateral in any commercial manner."

45.    MFSC's failure to pay to Plaintiff more than $550,000 in dividends due under the Certificate of Amendment based on Plaintiff's holdings of Series A preferred stock is a failure of MFSC to pay amounts due to Plaintiff, and thus constitutes an "Event[] of Default" § Section 12(a) of the Funding Agreement.

46.    In addition, as explained in the paragraphs below, Plaintiff would not have undertaken either transaction had it known that the purportedly revolutionary technologies did not exist at all, or had it known the true state of MFSC's business and finances, and had Defendants not repeatedly lied to Plaintiff about the company's true business and financial condition.

### *MFSC's Business Model*

47.    MFSC purported to be a typical startup: a company with a seemingly good idea that requires cash to get off the ground.  Founded in 2018 by Ellenis, the company billed itself as a go-between for municipal governments and vendors.  Per MFSC's website, the company's mission was to "emerge as the recognized leader in the government sector by providing our clients and strategic partners with outstanding service and exceptional value designed to significantly improve their financial dispositions while strengthening the communities in which we serve."

48.    Bluster aside, MFSC claimed to try to achieve that goal through its principal product, the AMP platform.  The D&O Defendants represented that the AMP platform, "is a non-factoring accounts payable program provided to local governments" at, MFSC said, "absolutely no cost" to local governments.  The D&O Defendants repeatedly represented that the AMP platform technology (a) existed, and (b) worked.  It did not.

49.    To understand what a "non-factoring accounts payable program" is requires an understanding of municipal finance.  Like any government entity, municipal governments often contract with vendors for various government services.  Those contracts result in sizeable accounts

payables (i.e., unpaid debts) for municipal budgets. Often, because of the bureaucracy inherent to any government office, municipal governments struggle to timely pay off their accounts payable. That, in turn, causes municipal governments to carry higher debt loads, which reduces their credit ratings and thus ability to borrow capital.

50.     On the other side of the ledger, a municipal government's higher accounts payable causes government vendors to carry higher accounts receivable—that is, the vendors' outstanding credits. High accounts receivables reduce vendors' cash flow positions, meaning they have less cash on hand to, say, meet their day-to-day expenses.

51.     The AMP platform purported to fix these twin problems. Here's how it was claimed to work. First, for a fee, MFSC represented that it would purchase a municipal government's accounts payable and the vendor invoices associated therewith. The AMP platform is a "non-factoring" platform because it purchases accounts payable. Typical "factoring" arrangements involve the purchase of accounts receivable. Second, MFSC planned to pay the municipality's unpaid debts to the government vendors, which would pay MFSC's fee associated with the transaction. Finally, the municipality would pay MFSC for the outstanding accounts payable. MFSC intended to finance the timely payment of the vendor invoices with debt borrowed from Plaintiff and other institutional lenders.

52.     An example follows: The City of Trenton, New Jersey, purchases a service from a vendor for $100. Without the AMP platform, the City would likely pay the vendor in 90 days, meaning the City would carry an account payable of $100, and the vendor an account receivable in the same amount, for three long months. With the AMP platform, however, MFSC was to purchase the $100 account payable from the City, pay the vendor within 30 days at a discount of, say, 3%, and then collect the outstanding $100 from the City in 90 days and charge the City a fee

for the service.  MFSC's revenue from the transaction was to be thus the 3% discount, from which it was to pay the financing cost of its lenders such as Plaintiff.

53.    The AMP platform thus purports to offer several advantages.  For one, MFSC's would-be purchase of a municipal government's accounts payable immediately clears the unpaid debts from the municipal government's balance sheets, improving its ability to borrow and contract with new vendors.  For another, MFSC's would-be payment of the vendors' bills on behalf of the municipal government improves the vendors' cash-flow positions because the vendors get paid faster.  And finally, if it ever actually worked – which it never did due to Ellenis' and others' misfeasance - the AMP platform would have given municipal governments more flexibility in paying their debts back to MFSC.

### Defendants' Fraud

54.    But the AMP platform, even if it had actually existed, would require upfront capital to fund the platform.  After all, no municipality would agree to sell its accounts payable to a startup company that didn't have the cash on hand to pay the municipality's vendors.  Indeed, though the AMP platform attracted interest from several municipal clients at its onset, MFSC failed to actually provide any services to any municipalities or generate a dollar's worth of revenue.

55.    This need for cash caused Defendant Ellenis and others at the company to turn their attention to lenders, which could provide the liquidity MFSC needed to jumpstart the AMP platform.  But here again the D&O Defendants faced a problem: How could MFSC convince lenders (like Plaintiff) that it was a good investment?  After all, the AMP platform had yet to prove itself.

56.    The answer, it turns out, was through fraud.  To induce Plaintiff to lend MFSC money, Defendants repeatedly mischaracterized the state of the AMP technology, as well as

MFSC's finances, the firmness of the company's municipal contracts, and the reality of the company's technological claims and financial forecasts.

57.    Ellenis lied to the President of Plaintiff's manager about at least three material developments at MFSC:  (1) that MFSC had secured anywhere from $550 million to $9.6 billion in lending commitments, (2) that MFSC had at least $2.5 million cash on hand and would achieve positive revenue as a result, and (3) that MFSC's relationships with municipalities would lead to further revenue.  Upon information and belief, one or more of the other D&O Defendants knew of Ellenis' misrepresentations to Plaintiff, and aided and abetted Ellenis and others at MFSC in their making of those misrepresentations; the remaining D&O Defendants should have known about the misrepresentations, and negligently failed to prevent them, or to reveal them when they were, or reasonably should have been discovered.

### Statements about Technologies

58.    Ellenis and most of the other D&O Defendants lied about the nature and extent, if not the very existence, of the AMP, which in reality was mostly a conglomeration of existing technologies from third-party vendors, that defendants passed off as their own.  Hospes willfully misrepresented that he had created something he had not.  The tech stack for this tech start up was mostly non-existent, and nothing close to the valuable proprietary technology that the defendants' repeatedly represented Plaintiff was investing in.

### Statements about Lending Commitments

59.    Ellenis engaged Plaintiff in January 2023 about the prospect of lending MFSC capital.  Earlier in 2022, Ellenis had reached out to Plaintiff regarding MFSC, but Plaintiff had declined interest due to large accrued and unpaid compensation benefits owed by MFSC to its employees.  As part of Plaintiff's diligence in 2023, Plaintiff asked Ellenis about MFSC's finances.

60.     On January 26, 2023, Ellenis sent Plaintiff a spreadsheet titled "Municipal Finance and Service Corp Lenders As of 24 January 2023." The spreadsheet purported to show that MFSC had 18 lenders and a total commitments ranging from ***$1.795 to $9.6 billion, a claim reiterated by Ellenis in conversations with Plaintiff at the time***. The spreadsheet further assured Plaintiff that "some lenders can exceed" the max commitment, meaning that MFSC could potentially borrow even more than $9.6 billion. A true and correct copy of that spreadsheet is attached hereto as ***Exhibit C***. In fact, in his Fed. R. Bankr. 2004 examination taken by Plaintiff's counsel in connection with the Bankruptcy Case, Ellenis now concedes that those parameters were, in fact, simply the parameters that the potential lenders identified on the spreadsheet typically loaned within, or the lenders' "sweet spots." As such, Ellenis' assertion that MFSC had lending commitments of upwards of $10 billion was false when made, and Ellenis knew and had scienter of that falsity, which was material.

61.     The spreadsheet also highlighted three lenders: (1) Advanced Energy Capital, with a maximum commitment of $50 million, (2) Collantes, with a maximum commitment of $400 million, and (3) Foundation Credit, with a minimum-to-maximum commitment of $50 to $200 million. In a high-importance email dated January 26, 2023 ("January 26 Email"), a true and correct copy of which is attached hereto as ***Exhibit D***, Ellenis described these highlighted rows (emphases added) as follows:

> As it pertains to our borrowing capacity and lender commitments, those highlighted upon the attached "Debt-Lenders Schedule" are ***those whom committed and with whom we have firm commitments*** and are in final doc execution; As reflected those lenders include; ***AEC Holdings- $50mm; Collantes Family Office - $400mm, and; Foundational Credit - $100mm***.

In other words, Defendant Ellenis represented to Plaintiff that MFSC had secured access to at least ***$550 million*** in capital. In fact, Bodnick testified in his Fed. R. Bankr. P. 2004 examination taken in connection with the Bankruptcy Case that these "commitments" were speculative at best, and

that he knew that AEC had flatly refused to loan money to Ellenis and MFSC. Upon information and belief, one or more of the other D&O Defendants were aware of these misrepresentations and assisted in providing the false information. Specifically, Miragliotta was copied on the email and was complicit in Ellenis' delivery of same to Plaintiff.

62.    In the same email, Defendant Ellenis further represented, "There are other **lenders with whom we have secured commitments** and are awaiting form docs." Taken together with the spreadsheet, Defendant Ellenis left Plaintiff with the impression that MFSC had ready access to hundreds of millions—if not billions—of dollars and that 18 other lenders had already conducted due diligence and agreed to lend to MFSC. Those representations were false when made, a fact known to Ellenis and other of the D&O Defendants.

63.    None of this was true. Balance sheets for the year 2023 from MFSC show that, as of the beginning of January 2023, MFSC had **less than $50,000 cash on hand** and was running monthly expenses of more than $70,000. The balance sheets further show that, despite ballooning expenses throughout 2023, MFSC obtained no major lending commitments for the year other than Plaintiff's. In fact, the balance sheets show no multimillion-dollar lending commitments—much less any from the purported creditors listed in Ellenis's spreadsheet.

### Statements about MFSC's Solvency

64.    In another email to Plaintiff and copied to Miragliotta dated January 25, 2023 ("January 26 Email"), Ellenis misrepresented that "we currently have the capacity to achieve this [break-even] and become profitable funding operations with the remaining $2.5 mm that was recently secured in our Preferred Series A offering." A copy of that email is attached hereto as **Exhibit E**. In the January 26 Email, Ellenis similarly told Plaintiff that MFSC recently received a $2.5 million investment and that such investment was "**more than enough**" working capital to

"carry us beyond break-even *to profitability*."  In other words, Ellenis assured Plaintiff that, even without Plaintiff's investment, MFSC had at least $2.5 million cash available and that $2.5 million was sufficient to sustain MFSC's profitability.  In fact, Bodnick testified in his Fed. R. Bankr. P. 2004 examination that the $2.5 million that Ellenis was describing was the second half of Series A holder Sixth Borough Capital's $5 million investment in MFSC, and that, at the time, Sixth Borough Capital was in default of its investment obligation to MFSC and had no funds with which to fund the balance.  Upon information and belief, Ellenis knew that his statement to Plaintiff about this $2.5 million was false when made, and one or more of the other D&O Defendants, including without limitation, were aware of these misrepresentations and assisted in providing the false information.

65.    At the time, Ellenis was desperate to raise capital to keep the wheels spinning at MFSC, because he had burned through Sixth Borough Capital's first $2.5 million installment on its Series A Preferred purchase and any other funds that MFSC had.  As noted above, Plaintiff declined to engage with MFSC during 2022 due to the large accrued and unpaid compensation debt that MFSC owed to its officers and employees, as acknowledged by Ellenis in his Fed. R. Bankr. P. 2004 examination.  During their negotiations in January 2023, Ellenis advised Plaintiff that the officers and employees had forgiven those compensation obligations and that "the company has no debt" other than normal operating obligations and dividends due to then-current Preferred Series A holders.  *See* January 25 Email, p.2 (January 25, 2023 email from Ellenis to Plaintiff).  Ellenis claims to have obtained a similar debt forgiveness at the end of 2021.

66.    In fact, MFSC's employees had not forgiven all of the unpaid compensation debt: Bodnick, in his Fed. R. Bankr. P. 2004 examination, testified that he was owed approximately $500,000 in unpaid salary – his contractual annual salary was $375,000, and he was paid only

about $70,000 per year – as of the end of 2022.  Accordingly, Ellenis representation to Plaintiff in January 2023 that MFSC had no debt, and the implication that the employment compensation debt had been forgiven, was false when made, known to Ellenis.  Given that this was a threshold issue for Plaintiff in mid-2022, it is clear that Ellenis specifically concealed MFSC's outstanding ~$500,000 salary debt to Bodnick from Plaintiff in order to induce its $5 million investment in MFSC.

67.    Once Ellenis addressed the issues of (i) the amounts that other lenders had committed to lend to MFSC, i.e., up to $10 billion; (ii) the additional $2.5 million of Sixth Borough's $5 million investment; and (iii) employee debt forgiveness, he had a duty to tell Plaintiff the whole truth.  Ellenis blatantly and plainly did not do so, and thus actively, knowingly and intentionally misrepresented the state of MFSC's finances with the specific purpose of fraudulently inducing Plaintiff's investment.  In his January 2025 testimony, Bodnick testified that Ellenis knew at the time that he made these statements that the $2.5 million would not be forthcoming from Sixth Borough and that he knew that the claimed hundreds of millions of debt financing were not real.

68.    After Plaintiff invested in MFSC, Ellenis continued to mislead Plaintiff.  In a May 26, 2023 letter (the "May 26 Letter") from Ellenis to Plaintiff, a true and correct copy of which is attached hereto as ***Exhibit F***, Defendant Ellenis stated that MFSC "has not yet begun to generate positive revenues from operations."  However, the May 26 Letter assured that the company "anticipates a substantial increase in its projected monthly revenues beginning in October 2023" and that it "will begin generating positive cash flow by the fourth quarter of 2023."[1]

---

[1]In his Fed. R. Bankr. P. 2004 examination, Ellenis testified that this letter was addressed to Harold Ramsey, another investor, and that the inclusion of Plaintiff at the top of the letter was intended to be a "cc" of the letter to Plaintiff, in contravention of several hundred years' of convention regarding business correspondence.  Irrespective of what

69.     As such, three months after Plaintiff invested $5 million in MFSC, the D&O Defendants, through Ellenis that MFSC would begin generating revenue in the fourth quarter of 2023.

70.     By the time of the May 26 Letter, MFSC owed its first few dividends payment to Plaintiff, which were due monthly.  In the May 26 Letter Ellenis offered that Plaintiff, as a holder of Series A preferred stock, could either (a) "[r]eceive the balance of the [outstanding dividends] due in the form of the Company's common stock at the price of $.3622 per share" or (b) "[d]efer payment of the [outstanding dividends], with interest continuing to accrue through December 31, 2023." This suggested that the dividends would be payable once MFSC achieved positive cash flow in late 2023, concealing the truth that MFSC had insufficient funds to pay Plaintiff's dividends payments.  Instead of paying, Defendant Ellenis tried to sell Plaintiff on immediately converting its preferred shares—carrying with them all future dividend payments—into (ultimately worthless) MFSC common stock.

71.     Closer inspection of the 2023 balance sheets reveals the extent of MFSC's financial woes.  Those balance sheets reflect that, following Plaintiff's $5 million preferred stock purchase, MFSC was never profitable.  Each and every month after Plaintiff invested in MFSC, the company ran cash deficits in the hundreds of thousands of dollars.  Indeed, in little over ten months, ***MFSC lost more than $3.3 million*** without taking in any substantial income or new investments:

- March 2023:    -$408,256.24
- April 2023:     -$313,960.75
- May 2023:      -$380,832.12
- June 2023:     -$346,556.76

Ellenis' true intent was, the transmittal of the letter to Plaintiff constitutes a representation by Ellenis and the other D&O Defendants regarding MFSC's positive business prospects.

- July 2023:        -$295,156.63

- August 2023:  -$336,938.00

- Sept. 2023:      -$337,059.98

- Oct. 2023:       -$251,094.69

- Nov. 2023:       -$478,103.19

- Dec. 2023:       -$233,680.69

72.    In fact, by January 2024, notwithstanding Plaintiff's $5 million investment less than a year earlier, MFSC had less than $800,000 cash on hand and was burning through at least $122,000 a month.  A cash forecast prepared by Defendant Charnley in March 2024, a true and correct copy of which is attached hereto as ***Exhibit G***, revealed that MFSC would be out of money by the end of June 2024.  During his Fed. R. Bankr. P. 2004 examination, Bodnick confirmed that MFSC (i) was "running on fumes" when Plaintiff invested $5 million in February 2023 and (ii) burned through approximately $4.2 million of those funds by early 2024 when MFSC's board of directors terminated Ellenis and Miragliotta for misconduct and misappropriation of funds.  A February 21, 2024 "Shareholder Update" from MFSC's board advised shareholders that the company's "cash burn" in 2023 left "the Company with $758K in cash as of January 2024."

73.    MFSC's severe burn rate leads naturally to the question—where did the money go?  Start with where it didn't go: the AMP platform.  The 2023 balance sheets reveal that between February and December 2023, MFSC spent a paltry ***$380.61 on advertising, market research, and product promotion***—a mere fraction of a percent of Plaintiff's $5 million investment.

74.    Compare that with other entries on the balance sheet.  In January 2023, MFSC spent $7,821.71 on travel and expenses.  From February to December 2023, MFSC spent ***$219,132.97 on travel and expenses***, an average of almost $20,000 per month.  In March 2023 alone, MFSC

spent almost $45,000 on travel and expenses—more than six times the January 2023 amount—including $7,800 on meals and $8,800 on entertainment.

75.     Next was rent.  Upon information and belief,  in January 2023 and before, MFSC spent roughly $15,000 on monthly rent.  But in early 2023, MFSC moved into new lavish offices which were largely empty – save for McCarthy's law firm's office sublease - carrying *a monthly expense of $30,155.63*, more than double the January 2023 rental expense.  Indeed, Bodnick recalls the monthly expenses associated with these offices as being $40,000.  Given that MFSC was not doing any real business other than Ellenis flying around the country buying steak dinners and perusing wine lists,  this office space, comprising half a floor in a Class A office building in MetroPark in Iselin NJ, was completely unnecessary.  Upon information and belief, nearly all of MFSC's employees worked remotely and travelled.

76.     In fact, MFSC did not even use the office space for business purposes.  Defendants allowed McCarthy, a director, and his legal assistant to operate McCarthy's personal law office out of the office space based on a sublease.  McCarthy has acknowledged all of the foregoing to Plaintiff in conversations and in his Fed. R. Bankr. P. 2004 examination.

77.     For his part, Ellenis was using MFSC's coffers as his personal bank account because the company did not have cash available to pay his salary and he claims that MFSC was his only source of income.  As such, Ellenis had credit/debit card(s) linked to MFSC's business accounts, into which, upon information and belief, Plaintiff's $5 million investment had been deposited.  Fed. R. Bankr. P. 2004 examination and document discovery to date reveals that Ellenis used company funds to pay for his daughter's private school tuition, vacations, and personal purchases at convenience, grocery, liquor and other retail stores; for regular ATM cash withdrawals for personal and "business entertainment" purposes; payments to a business

associate's matrimonial lawyer, apparently in connection with a family matter that had nothing to do with MFSC or its business; and Mercedes and Lexus leases for Ellenis and his wife.

78.     During his Fed. R. Bankr. P. 2004 examination, Ellenis claimed that this practice was typical for start-up companies that do not have funds to meet regular payroll, and that these expenditures were booked as "advances" against future compensation once the company achieved revenue.  The assertion that such fraudulent behavior is typical is, of course, utter nonsense. Investment banker Scott admitted that this practice is complete anathema to start-up business practice in his Fed. R. Bankr. P. 2004 examination, and said that start-ups must run lean at least during the pre-revenue phase.

79.     Ellenis's long-time cohort Miragliotta, MFSC's purported CFO, was complicit in all of this and dutifully booked these improper use of corporate—and investor—funds as advances. By the time of the bankruptcy filing in June 2024, Ellenis had received approximately $800,000 in such advances, which MFSC listed as a loan receivable from Ellenis in its bankruptcy petition as discussed below.

80.     In an apparent effort to cover Ellenis' tracks and make his looting of the company coffers look legitimate, Miragliotta booked other officers' and employees' salary and other payments as expenses, resulting in the bankruptcy petition showing other loans receivable from those individuals, albeit in much lesser amounts.  For his part, Hospes said that he had no idea that his salary was being booked as such in his Fed. R. Bankr. P. 2004 examination, and has since repaid his "loan receivable" to the bankruptcy trustee.

81.     Ellenis misappropriation of MFSC assets began to come to light in mid-2022, when the board uncovered Ellenis' misfeasance, began to challenge his activities and made efforts to oust control of MFSC from Ellenis and Miragliotta, and their accusing other board members of

fiduciary and other breaches. Considerable turmoil ensued, resulting in Ellenis retaining Fox Rothschild LLP and Markham LLP at a cost of $200,000-$300,000 to conduct an internal investigation and a forensic audit, none of which resulted in any conclusive reports, but did bring to light the extent to which Ellenis was using company assets as his personal account. Ellenis never brought any of this internal strife to Plaintiff's attention.

### Statements about MFSC's Relationships with Municipalities

82.    Ellenis further left Plaintiff with the rosy impression that more money was around the corner. For example, in the same January 26 Email, Ellenis said, "given our developments with CSAC we anticipate hosting a 'Secondary Offering' during the Q2 which would be exclusively to . . . drive processing and revenue growth."[2] Put simply, Ellenis represented to Plaintiff that he expected MFSC's relationship with CSAC to bring in additional investors and add to the company's revenues. Upon information and belief, one or more of the other D&O Defendants were aware these misrepresentations and assisted in providing the false information.

83.    This too was a lie. As it turned out, MFSC's "recent developments" with CSAC resulted in little more than a "Marketing Partnership Agreement" executed in May 2023. In that agreement, MFSC agreed to pay CSAC the hefty sum of greater of $100,000 or 0.5% of administrative fees generated by the AMP platform in exchange for CSAC's promise to "distribute MFSC marketing materials to [CSAC] members and other prospective AMP users." In other words, MFSC agreed to pay CSAC $100,000 to hand out marketing brochures. Upon information and belief, the CSAC agreement led to *no contracts with California municipalities* nor in any way materially benefitted MFSC.

---

[2] "CSAC" refers to the California State Association of Counties Finance Corporation. The corporation's mission is to provide, among other services, investment funds to each of California's 58 municipalities.

84.     Notwithstanding this illusory and non-revenue-generating contract, Defendant Ellenis represented in the May 26 Letter that the agreement with CSAC was an "extraordinary development" that would cause "a substantial increase in its projected monthly revenue beginning in October 2023."

85.     Further contributing to this "substantial increase" in monthly revenues, the May 26 Letter said, was MFSC's "working to finalize an initial 20-jurisdictional 'pilot' program" with various federal agencies," which the letter billed as "the first ever inter-agency DEI initiative on a federal or state level."  In reality, however, MFSC never finalized the federal project and never received any contracts from this "first ever" program.

86.     These were not the first of Ellenis's lies about MFSC's customer base.  In the Master Loan Agreement, Ellenis represented that MFSC had contracted to purchase the accounts payable for at least three municipalities: (1) Fishers, Indiana, for approximately $1.7 million per month, (2) Fort Lauderdale, Florida, for approximately $3.8 million per month, and (3) Noblesville, Indiana, for approximately $1 million per month.  Indeed, the Funding Agreement specified that Plaintiff would fund these obligations for the first calendar year of each municipal contract.

87.     Ellenis continued to make misrepresentations after Discover invested.  In the May 26 Letter, Ellenis said that "the Company "*has offered* our hallmark AMP service to select jurisdictions and government agencies in Connecticut, Florida, California, Indiana, and Vermont." The May 26 Letter further stated that "[a]s of this date, we have received two (2) signed agreements."  However, those contracts never bore any business or generated any revenue.  The May 26 Letter never specified as to whether MFSC had ever purchased accounts payable from any municipality.

88.    As of February 9, 2023, when Plaintiff executed the Subscription Agreement and the Funding Agreement with MFSC, the D&O Defendants had not caused MFSC to purchase accounts payable from any of the three municipalities identified in the Funding Agreement.

*MFSC's Voidable and Fraudulent Transfers to Defendants MVS, GFS and CeleraFi*

89.    Further compounding MFSC's financial woes, upon information and belief, Ellenis caused MFSC to funnel investor money, assets and business opportunities that were property of MFSC to Defendants MVS and GFS, both of which are partially owned and/or controlled by Ellenis. MVS and GFS are identified on Ellenis' LinkedIn page. Similarly, Bodnick and Scott appear to have transferred MFSC's know-how to CeleraFi.

90.    Specifically, due to Ellenis' malfeasance in his operation of MFSC's business as discussed herein, and, more specifically, his misappropriation of hundreds of thousands of dollars of investor funds, MFSC terminated Ellenis by way of a Confidential Separation Agreement dated February 12 , 2024 ("CSA"). As a condition of Ellenis' agreement to the CSA, he required, and MFSC's remaining officers and directors agreed, that MFSC enter into a National Account Executive Agreement dated February 1, 2024 and a Commission Agreement dated February 12, 2024 with GFS (together, the "GFS Agreements") purporting to have GFS act as sales agent for MFSC, but which, in reality, Ellenis used to funnel MFSC's assets to GFS and MVS for no consideration, causing MFSC to fraudulently transfer those assets to GFS and thus to Ellenis.

91.    Ellenis purported to form GFS to serve as a national account executive for MFSC, but, in reality, it was yet another ruse to coopt corporate opportunities from MFSC. For instance, GFS established contacts with various Maryland municipalities and the Maryland Black Caucus in the state legislature ("Maryland Entities"), but, within weeks of his termination by MFSC,

Ellenis was in contact with those entities on behalf of newco MVS, which Ellenis formed using MFSC assets and know-how.

92.    According to Hospes in his Fed. R. Bankr. P. 2004 examination, after Ellenis was given the boot by MFSC's board, Miragliotta emailed Ellenis all of MFSC's "process documents that I [Hospes as CIO] had created, which they re-branded," meaning "the entire business flow, basically the intellectual property of how the solution works", i.e., the AMP platform.

93.    Further according to Hospes, the reason that MFSC entered into the GFS Agreements was because Ellenis had the contacts with the Maryland Entities and wanted to be able to control those relationships, but GFS did nothing for MFSC.

94.    To the contrary, as evidenced by an MVS "Executive Summary" and "Shareholder Update" dated June 2024, MVS took MFSC's process documents that Hospes prepared and used the same to describe MVS' municipal finance platform, which is virtually indistinguishable from the AMP platform touted by MFSC, for investors and potential municipal vendor customers. Bodnick, in his Fed. R. Bankr. P. 2004 examination, testified that these documents looked very similar to materials prepared by MFSC.  The Executive Summary identifies a multitude of former MFSC personnel/consultants as associated with MVS, including Ellenis, Miragliotta, Danny Vargas, Jeff Koch, Ron Bird, Rosa Mendez, William Palatucci, Andrew Telsey and others.

95.    Another document that Plaintiff has found in its investigation of the claims asserted herein is an undated MFSC "Technical Overview" that states in its "Overview" that MFSC and GFS "are the companies that own AMP and invoices and respectively [sic].  AMP and MVS are products of MSFS and GFS[ that] are providing the same service but with different technologies." The Overview continues:  "MVS does the same as APM [sic – should read AMP] but instead of using avidexchange [MFSC's would-be payment processor] MVS uses a custom-built portal."  The

Technical Overview goes on to set forth a "MFSC AMP Workflow Summary" with what appears to be supporting detailed flowcharts.  Immediately thereafter, the Technical Overview sets for a "GFSI MVS Workflow Summary" *which is virtually identical to the MFSC AMP Workflow Summary but for the entity names*.

96.    Bodnick, MFSC's Executive Vice President of Corporate Development testified that the Workflows in the Technical Overview look very similar to flowcharts that he and other developed for MFSC.  Ellenis claims to have never seen the Technical Overview before his Fed. R. Bankr. P. 2004 examination, but it is unclear who among the D&O Defendants other than Ellenis have knowledge of both MFSC's and MVS' workflows.  As such, it is apparent that Ellenis is lying when he denies knowledge of the Technical Overview, is the likely author of the same, and is denying knowledge of the document in an effort to conceal the inevitable conclusion: Ellenis and his minions took MFSC's workflow processes and coopted the same to MVS' purposes.

97.    Ellenis claims that MVS is different from MFSC because it markets its municipal finance services (which, as described in the Executive Summary, are virtually indistinguishable from MFSC's AMP product) because MVS markets to vendors, not municipalities.  This is a distinction without a difference, because, while the AMP program was to be sold to municipalities, it still relied upon vendor enrollments *because the vendors were paying the fees, just like the MVS program.*  Further, Ellenis admits having contacted various of the Maryland Entities on behalf of MVS that he had approached for MFSC, including the towns of Brentwood and North Brentwood and the cities of Laurel and New Carollton, so that his claim that MVS markets only to vendors rings hollow like much of his testimony.

***MFSC's Bankruptcy Filings Reveal Loans to Insiders.***

98.     On the Petition Date, MFSC filed its chapter 7 petition and its Statement of Financial Affairs and Schedules of Assets and Liabilities ("Schedules"). [Doc 1]. In its Schedules. Section 71 "Notes receivable," MFSC lists the following loans to insiders, among others:

    a.     Loan receivable from Defendant Ellenis - $800,070.84;

    b.     Loan receivable from Defendant Barnes - $238,070.58;

    c.     Loan receivable from Defendant Miragliotta - $99,815.58; and

    d.     Loan receivable from Defendant McGuire - $100,980.58.

    (collectively, "Insider Loans").

99.     The recipients of the Insider Loans are referred to herein as the "Insider Defendants." These Insider Loans by MFSC to its officers and directors were, upon information and belief, funded with investor funds, including Plaintiff's $5 million purchase price for its Series A Preferred stock. Those investor funds were undoubtedly the source of the Insider Loans, because MFSC has never had any revenue and no other source of funding.

100.    As the Insider Loans are outstanding, it is likewise clear that the recipient insiders gave no, much less adequate, consideration for the loans. Accordingly, the Insider Loans constitute fraudulent transfers to the Insider Defendants.

101.    Further, the Insider Loans are evidence of the D&O Defendants' self-dealing and domination of the affairs of MFSC to their own benefit and the detriment of MFSC, its business, its creditors and its investors, most significantly, Plaintiff.

### MFSC's Financial Insolvency and Default of its Obligations to Plaintiff

102.    Unsurprisingly, the D&O Defendants' lies eventually caught up with MFSC.

103.    First, in August 2023, Ellenis stepped down as CEO of MFSC. In the later-executed CSA, Ellenis agreed to surrender his MFSC common stock in consideration of "all payroll

advances" and "*all questionable expenses* that were incurred during Ellenis' tenure as an officer, director, and/or employer of MFSC resulting from the independent audit conducting in 2023."

104.    Second, in January 2024, the D&O Defendants caused MFSC to default on its lease agreement.  In a February 5, 2024 email, Bodnick told Plaintiff that, "[W]e have not paid the rent for January, and Jim McCarthy, our general counsel, is currently in discussions with the [l]andlord's rep[resentative] to negotiate a separation or solution."

105.    Third, and critically, by March 2024, the D&O Defendants admitted that they could not pay almost $600,000 in past-due dividends payments to Plaintiff.  By that time, *Defendants had missed more than a year of monthly dividends' payments owed to Plaintiff*, as holder of Series A preferred stock.

106.    Each of these three events qualifies as at least one of the six "Events of Default" listed in § 12 of the Funding Agreement.

107.    Specifically, Defendant Ellenis's stepping down as CEO of MFSC due to questionable expenses is a "a material adverse change in the business, operations, or conditions (financial or otherwise) of" MFSC, as provided for in § 12(e) of the Funding Agreement.

108.    MFSC's inability to pay rent revealed that MFSC was insolvent, an event qualifying under § 12(b) of the Funding Agreement.

109.    In addition, MFSC's failure to pay Plaintiff almost $600,000 in dividends payments is an event of default under § 12(a) of the Funding Agreement.  That section says an event of default occurs when "Borrower [MFSC] fails to pay any amount owed to Lender [Plaintiff] when due."

110.    On March 25, 2024, Plaintiff, through Plaintiff, sent MFSC a "Notice of Default," a true and correct copy of which is attached hereto as ***Exhibit H***.  The Notice of Default listed five events of default:

      a.    MFSC failed to pay dividends on its Series A preferred shares, in excess of $540,000 to date.

      b.    MFSC was financially insolvent.

      c.    A material adverse change in MFSC had occurred.

      d.    MFSC had materially breached the Funding Agreement by committing corporate waste, mismanagement, misappropriation, fraud, self-dealing, and oppression under N.J. Stat. Ann. § 14A:14-7.

      e.    MFSC had caused over $4 million of Plaintiff's investment to dissipate.

111.    The Notice of Default gave MFSC 30 days to cure.  Prior to filing bankruptcy, MFSC failed to cure its default to Plaintiff.

112.    On April 26, 2024, Plaintiff issued a "Notice of Sale" notifying MFSC that Plaintiff would conduct a UCC sale of its collateral under the Funding Agreement.

### The D&O Defendants Operated MFSC as a Ponzi Scheme

113.    Still more, the D&O Defendants admitted that they selectively chose not to pay Plaintiff its contractually owed dividends payments.  In a March 23, 2024 email, Plaintiff asked Charnley, "How much [dividends are] currently owed in the Series A given the default?"  The next day, Charnley responded,

> Of the 22.1M Ser A shares, 4.59M shares opted to receive additional common shares in lieu of all future Ser A related coupon payments.  The remaining 17.39M shares consist of Plaintiff, Sixth Borough, and Preet Sharat & Sharat Mavinker which elected to continue receiving the coupon payments. ***Based on our audit, it appears the Company is in default with Plaintiff only.***

Asked if MFSC defaulted only on Plaintiff's dividends payments, Charnley responded, "***Yes, I made payments to Sixth Borough Capital*** in line with what Robert [Miragliotta] was paying and what he communicated to them."

114.    In other words, the D&O Defendants—as conceded by Charnley and Miragliotta—agreed to pay dividends to at least one older shareholder, Sixth Borough Capital.  The same email further reveals that the D&O Defendants appeared to cause MFSC to continue to make dividends payments to shareholder Preet Sharat & Sharat Mavinker.

115.    Given that Plaintiff's $5 million paid to purchase its Series A preferred shares in February 2023, the D&O Defendants used those funds, at least in part, to make dividends payments to satisfy older shareholders and to induce them to continue to capitalize MFSC.

116.    For instance, on information and belief, Sixth Borough Capital invested $2.5 million in MFSC in 2022 and failed to invest the additional $2.5 million that it contracted for – apparently, by the time that Plaintiff invested in February 2023, Ellenis and the others had caused MFSC to blow through almost all of the previously raised funding.  Following Plaintiff's $5 million investment in February 2023, MFSC raised no further capital.  The upshot is that the D&O Defendants caused MFSC to use Plaintiff's $5 million investment to pay dividends to an older shareholder in the hopes of inducing its continued capitalization of the D&O  Defendants' fraudulent scheme.

117.    Similarly, on information and belief, Sharat Mavinker owned 276,090 Series A preferred shares and warrants as of December 2022—meaning that he invested in MFSC *before* Plaintiff's $5 million investment.  Yet, the D&O Defendants appeared to cause MFSC to use Plaintiff's $5 million investment to pay dividends to Mr. Mavinker  his company and another

33

shareholder, Preet Sharat in the hopes of inducing their continued funding of the fraudulent scheme.

118.    If that behavior sounds like a Ponzi scheme, it's because it is.  A Ponzi scheme is a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 343 n.1 (3d Cir. 2001); *see also In re NJ Affordable Homes Corp.*, No. 05-60442, 2013 WL 6048836, at *18 (D.N.J. Nov. 8, 2013) (defining a Ponzi scheme as "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments.  Money from the new investors is used directly to repay or pay interest to earlier investors, usually without any operation or revenue-producing activity other than the continual raising of new funds . . . ." (alteration in original) (quoting Black's Law Dictionary 1278 (9th Cir. 2009))).

119.    Indeed, in addition to the Individual Defendants' concession that they paid off older investors but refused to cause MFSC to pay Plaintiff's dividends payments, ample evidence supports the existence of the Individual Defendant's Ponzi scheme:

    a.    MFSC conducted little or no legitimate business operations as represented to investors, as evidenced by the failure to bring in any substantial revenue from municipal clients from 2023 to present.

    b.    MFSC's business was never profitable and was never close to profitable even with a $5 million cash infusion from Plaintiff.

    c.    The lack of any legitimate business caused MFSC to rely on Plaintiff's $5 million investment to pay existing investors.

d.      Once MFSC spent the lion share of MFSC's investment, it became
financially insolvent, as evidenced by the company's failure to make
monthly rent payments, failure to pay Plaintiff's $600,000 in dividends, and
bankruptcy filing.

120.    Accordingly, Plaintiff was defrauded by the D&O Defendants' operation of MFSC
as a Ponzi scheme.  A Ponzi scheme is a fraud per se, and this court should presume the D&O
Defendants' fraudulent intent based on the nature of the scheme itself.  *E.g.*, *In re Manhattan Inv.
Fund Ltd.*, 397 B.R. 1, 8 (S.D.N.Y. 2007) ("There is a general rule—known as the 'Ponzi scheme
presumption'—that such a scheme demonstrates 'actual intent' as matter of law because 'transfers
made in the course of a Ponzi scheme could have been made for no purpose other than to hinder,
delay or defraud creditors.'"); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 429 (S.D.N.Y. 2006)
("Plaintiffs' complaint adequately pleads fraudulent intent on the part of the transferor—namely,
the defrauding defendants—who are alleged elsewhere in the complaint to be perpetrators of a
Ponzi scheme." (collecting cases)); *In re Carlton*, No. 20-19781, 2023 WL 8057870, at *8 (Bankr.
D.N.J. Nov. 20, 2023) ("As the Ponzi scheme presumption provides that there is a presumption of
actual intent to defraud, . . . [the plaintiff's actual fraud allegations] survive even under the Rule
9(b) standard.").

### *Defendants' False Statements to Shareholders About Plaintiff*

121.    Following Plaintiff's Notice of Default, the D&O Defendants scrambled to keep
their fraudulent scheme in place by making further false statements, now about Plaintiff.

122.    In a April 2024 "Monthly Shareholder Update," a true and correct copy of which is
attached hereto as ***Exhibit I***, which was distributed to all shareholders of MFSC, certain of the
D&O Defendants told MFSC's shareholders that Plaintiff "is purporting to conduct a Uniform

Commercial Code foreclosure process on all assets of the Company." The update went on to inform shareholders that MFSC's counsel had informed Plaintiff "of the lack of any legal basis for such process."

123.    The update further stated, "It is apparent that Plaintiff is attempting to use a baseless legal process to extract value from the Company to which it is not entitled." In other words, MFSC told its shareholders that Plaintiff was engaging in vexatious legal proceedings. Attached to the update was MFSC's counsel's letter of April 29, 2024 to Plaintiff, which stated "[a]s you have not responded to our letter [of April 23], we can only assume that your actions (including your gratuitous emailing of the Notice of Sale to MFSC's shareholders) are intended to cause disruption in and attempt to extract value from MFSC to which you are not entitled."

124.    Those statements were false. As stated above, § 12 of the Funding Agreement defines one of the "Events of Default" as "Borrower [MFSC] fails to pay *any amount owed* to Lender [Plaintiff] when due." The Funding Agreement does not restrict that clause to amounts owed in the Funding Agreement itself.

125.    Indisputably—and as admitted by the D&O Defendants—MFSC failed to pay Plaintiff almost $600,000 in monthly dividends payments, as required by the Certificate of Amendment. "[I]t has been generally recognized in this country that the charter of a corporation is a contract both between the corporation and the state and the corporation and its stockholders. It is not necessary to cite authorities to support this proposition." *Lawson v. Household Fin. Corp.*, 152 A. 723, 727 (Del. 1930).

126.    Thus, by failing to pay Plaintiff its monthly dividends payments, a contractually owed amount due to Plaintiff, MFSC defaulted under the Funding Agreement.

127.    Section 13 of the Funding Agreement provides as a remedy that "Lender [Plaintiff] may exercise all rights and remedies under this Agreement and the law, including those of a secured party under the Uniform Commercial Code or Bankruptcy Code, and the right to collect, dispose of, sell, lease, use, and realize upon all Financed Receivables and Collateral in any commercial matter."   In other words, the Funding Agreement provides an express remedy of foreclosure on MFSC's assets.  *See* Uniform Comm. Code § 9-601(a) ("After default, a secured party has the rights provided in this part and . . . those provided by agreement of the parties.  A secured party: (1) may reduce a claim to judgment, *foreclose*, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure." (emphasis added)).

128.    There is no question that Plaintiff has a legal basis to call a default under the Funding Agreement, commence foreclosure proceedings and enforce its other legal remedies against MFSC in March 2023.  Accordingly, MFSC's and the D&O Defendants' statement in the April 2024 Shareholder Update that Plaintiff was attempting to extract value from MFSC to which Plaintiff was not entitled was false when made, libelous and cast Plaintiff in a false light in the eyes of the other shareholders, entities and investors with which Plaintiff has business relationships.  As a result, Plaintiff has been damaged.

### *MFSC Failed to Conduct a Shareholder's Meeting Before Filing Bankruptcy*

129.    Finally, before filing the Bankruptcy Case, MFSC and certain of the D&O Defendants failed to advise shareholders of their intention to do so.  Previously, these defendants had misrepresented to certain shareholders that a shareholders meeting would be held before MFSC took any precipitous action, which filing the Bankruptcy Case certainly constituted.

## CAUSES OF ACTION

## COUNT ONE
### Violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 –
### 15 U.S.C. § 78j(b)
(*Against All D&O Defendants*)

130.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

131.    The D&O Defendants, through Ellenis and Miragliotta, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of MFSC's securities in an effort to maintain artificially high market prices for MFSC's securities in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

132.    The D&O Defendants made several material factual misrepresentations, as well as omissions of material facts necessary to make statements made not misleading, in connection with the Investment Agreement.  Specifically:

    a.    On January 26, 2023, Ellenis sent Plaintiff a spreadsheet purporting to show that MFSC either had secured or was close to securing anywhere from $1.795 to $9.6 billion in lending commitments.

    b.    On January 26, 2023, Ellenis emailed Plaintiff that MFSC had firm commitments from at least three lenders in an amount of $550 million.

    c.    On January 26, 2023, Ellenis emailed Plaintiff that MFSC had "more than enough" funds to either break even or achieve profitability in the 2023 fiscal year, and that MFSC was receiving an additional $2.5 million in proceeds of the sale of its Series A Preferred stock.

d.    On January 26, 2023, Ellenis emailed Plaintiff that MFSC's recent relationship with CSAC would cause the company to host a secondary offering, which would help develop further revenue streams.

e.    On February 9, 2023, the D&O Defendants, through Ellenis and Miragliotta, caused MFSC to execute the Funding Agreement with Plaintiff, which represented that MFSC had firm contracts with three municipalities, worth up to $6.5 million per month.

133.    The D&O Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentality of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to make factual misrepresentations and conceal adverse material information about the business, operations, and future prospects of MFSC, as specified herein.

134.    The allegations above establish a strong inference that the D&O Defendants acted with scienter in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts.  For example, the following facts strongly support a finding that Defendants acted with scienter:

a.    The D&O Defendants operated MFSC as a Ponzi scheme, and fraudulent intent may be presumed as a matter of law.

b.    When Ellenis told Plaintiff in January 2023 that MFSC had $2.5 million in proceeds of the sale of Series A Preferred to Sixth Borough Capital to be used to get MFSC to generating revenues, that statement was false.  Sixth Borough Capital had defaulted on its investment contract by failing to pay

those funds, had no money to do so, facts known to Ellenis and the other D&O Defendants at the time.

c.    Similarly, when Ellenis told Plaintiff in January 2023 that MFSC had up to $10 billion in lending commitments from other lenders, that statement was false.   The lending ranges cited by Ellenis were nothing more than institutional lenders' deal size parameters, and bore no relationship whatsoever to any commitment that any lender had made to MFSC.   The three lenders that Ellenis highlighted as being firm commitments were, in fact, not obligated in any manner, and, according to Bodnick, one, AEC, had affirmatively told Ellenis that it would not lend to MFSC.   Ellenis, and thus the other D&O Defendants, knew all of this.   Nevertheless, Ellenis concocted an elaborate false story to induce Plaintiff's investment.

d.    The three municipal clients that Ellenis and MFSC represented to Plaintiff in the Funding Agreement as firm were anything but, a fact known to Ellenis and the other D&O Defendants.

e.    The D&O Defendants, as senior officers, managers, and directors, of MFSC had the ultimate authority to make representations on behalf of MFSC at all times relevant to the allegations in this Complaint.   Indeed, these Defendants had direct involvement in the daily business of MFSC and participated in the preparation and dissemination of MFSC's materially false and misleading statements as set forth above.

f.    At all times relevant to these allegations, the D&O Defendants had a motive to lie and misrepresent the state of MFSC's finances to sell MFSC

securities.  Specifically, the D&O Defendants needed new investor funds to pay old investors' monthly dividends payments; Ellenis needed Plaintiff's investment in order to continue to finance his use of corporate coffers as his personal bank account to pay his personal expenses; and the D&O Defendants, who were shareholders themselves, sought to perpetuate MFSC's losing operations in an effort to salvage the value of their investments.  Indeed, much of the compensation awarded to various of the D&O Defendants during the years prior to 2023 was in the form of common stock, so that the Defendants were motivated to permit Ellenis to take any steps to keep the company going.

g.    The D&O Defendants used investment funds from Plaintiff to pay at least three older investors.  In a March 24, 2024 email between Charnley and Plaintiff, Charnley admitted that both he and Miragliotta authorized dividend payments to Sixth Borough Capital and two other small investors, despite refusing to pay past-due dividends to Plaintiff.

h.    The D&O Defendants used investment funds from Plaintiff on unnecessary expenses—including expensive new offices and travel and entertainment incurred by Ellenis and others for their own purposes, which in many cases did not even involve entertaining prospective clients—while using little to fund the AMP platform.  Further, the D&O Defendants stood by while Ellenis siphoned $800,000 in investor funds from MFSC to pay for his extravagant lifestyle.

i.    On May 26, 2023, Ellenis stated that MFSC would likely generate revenue in the fourth quarter of 2023 which proved to be false.

j.    On May 26, 2023, Ellenis stated to Plaintiff that MFSC had signed two firm contracts with municipal clients, which it had not in any meaningful sense- even though contracts were signed, they generated no business or revenue.

k.    Ellenis stepped down as CEO of MFSC on August 21, 2023, and was terminated by the board altogether at the end of 2023, due to "questionable" expenses and his general mismanagement of the company, including wasteful expenditures on offices, travel, entertainment, unnecessary headcount, and failure to conduct proper diligence in order to qualify targeted municipalities. The latter instance of misfeasance resulted in a waste of investor funds pursuing municipalities, like Ft. Lauderdale, which had no use of the AMP platform because they paid their vendors on time. As such, the limited amount of investor funds that MFSC used to pursue business was largely wasted due to the D&O Defendants' incompetence in failing to understand their potential client base.

135.    At the time Plaintiff purchased MFSC's Preferred Series A, the D&O Defendants owed Plaintiff a duty to disclose the true state of MFSC's finances and customer base because of the fiduciary relationship and general relationship of trust and confidence that existed between shareholders and senior managers and directors of MFSC.

136.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of MFSC securities was artificially inflated. In ignorance of the fact that prices of MFSC securities were artificially

inflated, and relying directly or indirectly on the materially false and misleading statements made by the D&O Defendants, and/or on the absence of material adverse information that was known to or recklessly disregarded by the D&O Defendants but not disclosed to Plaintiff, Plaintiff purchased MFSC securities at artificially high prices and was damaged thereby.

137.    At the time of the D&O Defendants' material misrepresentations and omissions, Plaintiff was ignorant of their falsity.  Had Plaintiff known the truth, it would not have purchased MFSC securities.

138.    By virtue of the foregoing, the D&O Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder/15 U.S.C. § 78j(b).

139.    As a direct and proximate result of the D&O Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchase of MFSC securities.

## COUNT TWO
### Violation of § 12(a)(2) of the Securities Act of 1933 – 15 U.S.C. § 77l(a)(2)
(Against All D&O Defendants)

140.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

141.    The D&O Defendants, through Ellenis and Miragliotta, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of MFSC's securities in an effort to maintain artificially high market prices for MFSC's securities in violation of Section 12(a)(2) of the Securities Act of 1933.

142.    The D&O Defendants made several material factual misrepresentations, as well as omissions of material facts necessary to make statements made not misleading, in connection with the Investment Agreement, all as set forth in the paragraphs above.

143.    As set forth above, MFSC sold its Series A Preferred stock and related securities to Plaintiff by means and instrumentalities of interstate commerce, including email, telephone and regular United States mail.

144.    As further set forth above, Ellenis, Miragliotta and other of the D&O Defendants induced Plaintiff's investment in MFSC with oral and written statements of material fact or omissions of material facts that were necessary to make those individuals statements, in light of the circumstances, not misleading.

145.    Ellenis, Miragliotta and/or other of the D&O Defendants actively and successfully solicited Plaintiff's investment in and purchase of MFSC's securities, or, at minimum, participated in the preparation of false information provided to Plaintiff to induce that investment.

146.    At the time of the D&O Defendants' material misrepresentations and omissions, Plaintiff was ignorant of their falsity. Had Plaintiff known the truth, it would not have purchased MFSC securities.

147.    By virtue of the foregoing, the D&O Defendants have violated Section 12(a)(2) of the Securities Act/15 U.S.C. § 77l(a)(2).

148.    As a direct and proximate result of the D&O Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of MFSC securities.

**COUNT THREE**
**Violation of New Jersey Uniform Securities Law, N.J.S.A. § 49:3-47 *et seq.***
(*Against All D&O Defendants*)

149.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

150.    The D&O Defendants' actions described in Count One constitute violations of N.J.S.A. § 49:3-52, titled "Unlawful Actions," in that the D&O Defendants unlawfully, in connection with the offer, sale and purchase of MFSC's sale of its Series A preferred stock (a)

44

employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of MFSC securities in an effort to maintain artificially high market prices for MFSC securities.

151.    In turn, N.J.S.A. § 49:3-71, titled "Action for deceit; liability," provides that any person who offers, sells or purchases securities employing the devices, acts and practices described in in the paragraphs above, "is liable as set forth in subsection (c) of this section."  That subsection provides, in pertinent part, that such person is liable to the counterparty to the sale of the subject security, which counterparty "may bring an action either at law or in equity to recover the consideration paid for the security . . . upon the tender of the security and any income received . . . on the security."  Subsection (e) also provides that "[a]ny tender specified in this section may be made at any time before entry of judgment."

152.    At the time Plaintiff purchased MFSC securities, the D&O Defendants owed Plaintiff a duty to disclose the true state of MFSC's finances and customer base because of the fiduciary relationship and general relationship of trust and confidence that existed between shareholders and senior managers and directors of MFSC.

153.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of MFSC securities was artificially inflated.  In ignorance of the fact that prices of MFSC securities were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by the D&O Defendants, and/or on the absence of material adverse information that was known

to or recklessly disregarded the D&O Defendants but not disclosed to Plaintiff, Plaintiff purchased MFSC securities at artificially high prices and was damaged thereby.

154.    At the time of said material misrepresentations and omissions, Plaintiff was ignorant of their falsity and of the D&O Defendants' material omissions.  Had Plaintiff known the truth, it would not have purchased the MFSC securities.

155.    By virtue of the foregoing, the D&O Defendants have violated the aforesaid sections of the New Jersey Uniform Securities Law, and Plaintiff is entitled to bring this action to hold the D&O Defendants liable under that law.

156.    As a direct and proximate result of the D&O Defendants' wrongful conduct, Plaintiff has suffered damages as a result of its purchase of MFSC securities.

### COUNT FOUR
**Common Law Fraud**
(Against All D&O Defendants)

157.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

158.    The D&O Defendants made several material factual representations of material fact in connection with the Investment Agreement.  Specifically:

   a.    On January 26, 2023, Ellenis sent Plaintiff a spreadsheet purporting to show that MFSC either had secured or was close to securing anywhere from $1.795 to $9.6 billion in lending commitments.

   b.    On January 26, 2023, Ellenis emailed Plaintiff that MFSC had firm commitments from at least three lenders in an amount of $550 million.

   c.    On January 26, 2023, Ellenis emailed Plaintiff that MFSC had "more than enough" funds to either break even or achieve profitability in the 2023 fiscal year, and that MFSC had $2.5 million in investor cash, when, in fact, Sixth

Borough Capital was in default of its investment commitment and had no

funds, facts known to Ellenis and other D&O Defendants at the time.

d.    On January 26, 2023, Ellenis emailed Plaintiff that MFSC's recent

relationship with CSAC would cause the company to host a secondary

offering, which would help develop further revenue streams.

e.    On February 9, 2023, the D&O Defendants caused MFSC to execute the

Funding Agreement with Plaintiff, which agreement represented that MFSC

had firm contracts with three municipalities, worth up to $6.5 million per

month.

159.    Upon information and belief, the D&O Defendants were aware of and endorsed

Ellenis' communications with Plaintiff, knew that these representations were false when made,

and knew that Ellenis and MFSC were making these representations to Plaintiff in order to induce

Plaintiff's $5 million purchase of MFSC's Series A Preferred.  Specifically:

a.    The D&O Defendants operated MFSC as a Ponzi scheme, and fraudulent

intent may be presumed as a matter of law.

b.    The D&O Defendants, as senior officers, managers, and directors, of MFSC

had the ultimate authority to make representations on behalf of MFSC at all

times relevant to the allegations in this Complaint.  Indeed, the D&O

Defendants had direct involvement in the daily business of MFSC and

participated in the preparation and dissemination of MFSC's materially

false and misleading statements as set forth above.

c.    At all times relevant to these allegations, the Individual Defendants had a

motive to lie and misrepresent the state of MFSC's finances to sell MFSC

securities. Specifically, the Individual Defendants needed new investor funds to pay old investors' monthly dividends payments and to continue to fund MFSC's exorbitant expenditures, including without limitation expensive offices, Ellenis' personal expenses, and pursuit of potential municipal clients without first qualifying the same to determine if the targets would actually benefit from use of the AMP platform.

d.      The D&O Defendants caused MFSC to use investment funds from Plaintiff to pay at least three older investors. In a March 24, 2024 email between Charnley and Plaintiff, Charnley admitted that both he and Miragliotta authorized dividend payments to Sixth Borough Capital and two individuals, despite refusing to pay past-due dividends to Plaintiff.

e.      The D&O Defendants used investment funds from Plaintiff on unnecessary expenses—including new offices and lavish travel and meals that had no business purpose—while using little to fund or effectively sell the AMP platform.

f.      On May 26, 2023, Ellenis stated to Plaintiff that MFSC would likely generate revenue in the fourth quarter of 2023, which it did not.

g.      On May 26, 2023, Ellenis stated to Plaintiff that MFSC had signed two firm contracts with municipal clients, which it had not, at least in any meaningful sense. Those contracts never produced any business or revenue.

h.      Ellenis stepped down as CEO of MFSC on August 21, 2023, was ultimately terminated by the Board of Directors at the end of 2023 due to "questionable" expenses. Thereafter, the Board stood by while Ellenis and

Miragliotta, in violation of the NEA, pirated business opportunities from MFSC, specifically relationships with various Maryland jurisdictions, and directed those opportunities to Ellenis' newco MVS.

160.    At a minimum, these facts show that the D&O Defendants made false statements in reckless disregard for these statements' truth.

161.    The D&O Defendants made or allowed to be made these false statements with the intent to deceive Plaintiff by inducing it to invest $5 million for the purchase of MFSC securities.

162.    Plaintiff relied on the false statements in agreeing to purchase $5 million in MFSC securities in the Investment Agreement and in agreeing to lend at least $6.5 million to MFSC in the Funding Agreement.  Indeed, the Funding Agreement explicitly contemplated that Plaintiff would continue to fund other municipal contracts for MFSC.

163.    Plaintiff's reliance on the false statements of the D&O Defendants was reasonable and justifiable under the circumstances given that it conducted due diligence on MFSC, which revealed no reason to doubt the truthfulness of the Individual Defendants' representations.

164.    As a direct and proximate result of the D&O Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchase of MFSC securities.

## COUNT FIVE
### Negligent Misrepresentation
(*Against All D&O Defendants*)

165.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

166.    The D&O Defendants made several incorrect statements of material fact in connection with the Investment Agreement.  Specifically:

a.    On January 26, 2023, Ellenis sent Plaintiff a spreadsheet purporting to show that MFSC either had secured or was close to securing anywhere from $1.795 to $9.6 billion in lending commitments.

b.    On January 26, 2023, Ellenis emailed Plaintiff that MFSC had firm commitments from at least three lenders in an amount of $550 million.

c.    On January 26, 2023, Ellenis emailed Plaintiff that MFSC had "more than enough" funds to either break even or achieve profitability in the 2023 fiscal year.

d.    On January 26, 2023, Ellenis emailed Plaintiff that MFSC's recent relationship with CSAC would cause the company to host a secondary offering, which would help develop further revenue streams.

e.    On February 9, 2023, the D&O Defendants caused MFSC to execute the Funding Agreement with Plaintiff, which represented that MFSC had firm contracts with three municipalities, worth up to $6.5 million per month.

167.    Upon information and belief, the D&O Defendants were aware of and endorsed Ellenis' communications with Plaintiff, knew that these representations were incorrect when made, and knew that Ellenis and MFSC were making these representations to Plaintiff in order to induce Plaintiff's $5 million purchase of MFSC's Series A Preferred.  The D&O Defendants should have known that these representations were incorrect when made.  Specifically:

a.    The D&O Defendants, as senior officers, managers, and directors, of MFSC had the ultimate authority to make representations on behalf of MFSC at all times relevant to the allegations in this Complaint.  Indeed, the D&O Defendants had direct involvement in the daily business of MFSC and

participated in the preparation and dissemination of MFSC's materially false and misleading statements as set forth above.

b.   At all times relevant to these allegations, the D&O Defendants had a motive to lie and misrepresent the state of MFSC's finances to sell MFSC securities.  Specifically, the D&O Defendants needed new investor funds to pay old investors' monthly dividends payments and to continue to fund MFSC's exorbitant expenditures, including without limitation expensive offices, Ellenis' personal expenses, and pursuit of potential municipal clients without first qualifying the same to determine if the targets would actually benefit from use of the AMP platform.

c.   The D&O Defendants caused MFSC to use investment funds from Plaintiff to pay at least three older investors.  In a March 24, 2024 email between Charnley and Plaintiff, Charnley admitted that both he and Miragliotta authorized dividend payments to Sixth Borough Capital and two individuals, despite refusing to pay past-due dividends to Plaintiff.

d.   The D&O Defendants used investment funds from Plaintiff on unnecessary expenses—including new offices and travel and non-business related entertainment—while using little to fund the AMP platform.

e.   On May 26, 2023, Ellenis stated to Plaintiff that MFSC would likely generate revenue in the fourth quarter of 2023.  This did not come to pass.

f.   On May 26, 2023, Ellenis stated to Plaintiff that MFSC had signed two firm contracts with municipal clients, which it had not in any meaningful sense

- even though contracts were signed, no business or revenue ever came from those contracts.

g.    Ellenis stepped down as CEO of MFSC on August 21, 2023, was ultimately terminated by the Board of Directors at the end of 2023due to "questionable" expenses. Thereafter, the Board stood by while Ellenis and Miragliotta, in violation of the NEA, pirated business opportunities from MFSC, specifically relationships with various Maryland jurisdictions, and directed those opportunities to Ellenis' newco MVS.

168.    Plaintiff relied on these incorrect statements in agreeing to purchase $5 million in MFSC securities under the Investment Agreement and in agreeing to lend at least $6.5 million to MFSC under the Funding Agreement. Indeed, the Funding Agreement explicitly contemplated that Plaintiff would continue to fund other municipal contracts for MFSC.

169.    Plaintiff's reliance on the false statements of the Individual Defendants was reasonable and justifiable under the circumstances given that it conducted due diligence on MFSC, which revealed no reason to doubt the truthfulness of the D&O Defendants' representations.

170.    As a direct and proximate result of the D&O Defendants' wrongful conduct, Plaintiff suffered damages in connection with their respective purchases of MFSC securities.

**COUNT SIX**
**Negligence**
**(Against all D&O Defendants)**

171.    Discover repeats and re-alleges each and every allegation contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

172.    At all times relevant herein, the D&O Defendants knew that Ellenis was viewed negatively in the municipal finance industry, yet permitted Ellenis to continue to interact with

potential customers to the detriment of MFSC's reputation and ability to develop business and generate revenues.

173.    For instance, Ellenis made repeated off-color and offensive comments to various government officials in Indiana, Florida, New Jersey, California and Connecticut, among others, during meetings in which MFSC was trying to sell the AMP platform.  Certain of those officials characterized Ellenis as a "problem" and MFSC's "one roadblock in New Jersey."

174.    Barnes characterized Ellenis' behavior as "constant use of off color, rude, offensive and foul language in front of outsiders, staff and oftentimes, in public."

175.    Ellenis' offensive behavior extended to meetings with potential investors, which had the effect of chilling discussions, despite investors' positive perception of the rest of the MFSC team.  This led certain of the D&O Defendants to note, as early as late 2022, that Ellenis' behavior raised the specter of the D&O Defendants' breaching fiduciary obligations to shareholders because that behavior was losing client opportunities.

176.    In early January 2023, various of the D&O Defendants, including Charnley, Hospes, Barnes and McCarthy learned that Ellenis and Miragliotta were causing MFSC to pay tens of thousands of dollars of Ellenis' personal expenses as discussed above and otherwise acting contrary to their fiduciary duties to shareholders.  Despite this knowledge, those defendants and others permitted Ellenis to continue to interact with potential customers and investors, including Discover, through and after Discover's investment in MFSC.

177.    On January 21, 2023, just days before Discover invested $5 million in MFSC, Hospes confronted Ellenis and told Ellenis that he and Mirigliotta could go to prison for their misfeasance in using MFSC funds for their personal gain.  Ellenis agreed that he and Miragliotta should step down.  The next day, this was all relayed by Hospes to other D&O Defendants,

including Barnes, McCarthy and Scott.  Nevertheless, the D&O Defendants permitted Ellenis to continue soliciting Discover's investment and making the material misrepresentations detailed above.

178.    The D&O Defendants did not take appropriate measures to prevent Ellenis from fraudulently soliciting Discover's investment.  As a direct and proximate result of the D&O Defendants' negligent and wrongful conduct, Discover suffered damages in connection with its purchase of MFSC securities.

### COUNT SEVEN
### Unjust Enrichment
(Against all D&O Defendants)

179.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

180.    Plaintiff conferred a benefit on MFSC and the other defendants by purchasing $5 million of MFSC Series A preferred shares and warrants.

181.    As part of Plaintiff's purchase of Series A Preferred shares and warrants, MFSC became obligated to pay monthly dividends to Plaintiff, as required by its Certificate of Amendment, expressly incorporated into the Investment Agreement.

182.    Plaintiff expected to be remunerated for its investment through MFSC's payment of monthly dividends, as required by MFSC's Certificate of Amendment.

183.    As of this date, MFSC owes Plaintiff more than $550,000 in unpaid dividends and has never paid Plaintiff any monthly dividends.

184.    The D&O Defendants have been unjustly enriched at the expense and detriment of Plaintiff.  Rather than remunerate Plaintiff its unpaid dividends, MFSC used that money to unjustly enrich itself by paying off older investors to induce further capitalization—in furtherance of the

D&O Defendants' Ponzi scheme—and by personally enriching the company's officers, directors, and senior managers, i.e. the D&O Defendants.

185.    Plaintiff may plead unjust enrichment in the alternative under Federal Rule of Civil Procedure 8(d).

## COUNT EIGHT
### Trade Libel
(Against All D&O Defendants Except Ellenis and Miragliotta)

186.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

187.    In light of the Defendants' willful failures to disclose all material facts to the investors and shareholders of MFSC, on April 22, 2024, Plaintiff asked the board of directors of MFSC to "please confirm that all shareholders have been provided with a copy of the Notice of default," for the express reason that, "It is important that everyone be kept fully informed."

188.    On or about April 23, 2024, certain of the D&O Defendants caused its counsel to send a formal letter to Plaintiff on the law firm's letterhead disputing the Notice of Default. On or about April 29, 2024, certain of the D&O Defendants caused its counsel to send a letter to Plaintiff containing the knowingly false accusation that Plaintiff's actions in lawfully seeking to enforce its contractual rights against MFSC and emailing the Notice of Sale to MFSC shareholders "are intended to cause disruption in an attempt to extract value from MFSC to which [Plaintiff is] not entitled." These D&O Defendants were fully aware that the accusation was a false statement of fact, and the letters were sent for the sole purpose of enabling the D&O Defendants to publish the libel.

189.    Bodnick, on behalf of the board of directors of MFSC then sent a written memorandum entitled "Monthly Shareholder Update" on April 29, 2024 to dozens of third parties, including institutional investors, accredited investors and other members of the investment

community in which Plaintiff does business, attaching the letters described above and containing the false statement of fact that: "It is apparent that Plaintiff is attempting to use a baseless legal process to extract value from the Company to which it is not entitled."

190. These D&O Defendants maliciously published these scurrilous allegations, even though they knew them to be completely false. These D&O Defendants were fully aware that Plaintiff was attempting to lawfully enforce its contractual rights. These D&O Defendants were further aware that Plaintiff's stated goal was to keep the stakeholders informed of material information concerning the company. In truth, Plaintiff providing information to stakeholders was making it more difficult for these D&O Defendants to continue to defraud and mislead them.

191. These D&O Defendants' false statements were calculated to harm Plaintiff's business by impugning its reputation which is the lifeblood of institutional investors like Plaintiff and thus constitute trade libel. As acclaimed investor Warren Buffet famously stated, "It takes 20 years to build a reputation and five minutes to ruin it."

192. These D&O Defendants' conduct directly and proximately caused direct harm to Plaintiff's business reputation. The communication resulted in pecuniary damage to Plaintiff by significantly damaging its reputation and causing the loss of future business.

## COUNT NINE
### Libel
(Against All D&O Defendants Except Ellenis and Miragliotta)

193. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

194. The statements described above are reasonably susceptible of a defamatory and libelous connotation, and a reasonable person would conclude that the published statements make or imply a provably false factual assertion.

195.    These D&O Defendants' conduct directly and proximately caused direct harm to Plaintiff, entitling Plaintiff to general damages.

## COUNT TEN
### False Light
(Against All D&O Defendants Except Ellenis and Miragliotta)

196.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

197.    These D&O Defendants held out Plaintiff to other members of the investment community as attempting to extract value to which it is not entitled These D&O Defendants' false presentation of Plaintiff was highly offensive to a reasonable person.  The characterization of Plaintiff would be objectionable to the ordinary person under the circumstances.  Defendants knew of the falsity of their statements and the false light in which Plaintiff would be placed.

198.    The actions by these D&O Defendants directly and proximately placed Plaintiff in a false light and caused damages to its reputation.

## COUNT ELEVEN
### Breach of Fiduciary Duty
(*Against All D&O Defendants*)

199.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

200.    By virtue of their position of control over MFSC, the D&O Defendants owned Plaintiff fiduciary duties of care, good faith and fair dealing.

201.    By virtue of his position as CEO of MFSC, Ellenis owed Plaintiff fiduciary duties of care, good faith and fair dealing.

202.    By engaging in the conduct described above, the D&O Defendants each breached their respective fiduciary duties to Plaintiff.

203.    By engaging in the conduct described above, the D&O Defendants negligently and/or knowingly disregarded their duties and engaged in irrational decision making in order to induce Plaintiff to advance funding to MFSC.

204.    As a direct and proximate result of the D&O Defendants' breaches of their fiduciary duties to Plaintiff, Plaintiff suffered substantial damages.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Awarding compensatory damages in favor of Plaintiff against all D&O Defendants, jointly and severally, for all damages sustained as a result of the D&O Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.    Awarding general damages as a result of the D&O Defendants' wrongdoing, in an amount to be proven at trial;

C.    Awarding punitive and exemplary damages, to punish and make an example of the D&O Defendants for their wrongful conduct, in an amount to be proven at trial;

D.    Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    For such other and further relief as the Court may deem just and proper.

**GIBBONS P.C.**

By: _____
Dale E. Barney, Esq.
One Gateway Center
Newark, New Jersey 07102-5310
Tel:   (973) 596-7474
Fax:  (973) 639-6244
dbarney@gibbonslaw.com
dcrapo@gibbonslaw.com

*Counsel for Plaintiff Discover Growth Fund II, LLC*

Dated: March 24, 2025